IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

GRAND TRUNK WESTERN
RAILROAD, INC.,

                              Plaintiff,                    Case No. 3:06 CV 1749

               -vs-
                                                           <u>MEMORANDUM   OPINION</u>

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES DIVISION,

                              Defendant.

KATZ, J.

        Before the Court is the motion of Plaintiff, Grand Trunk Western Railroad, Inc. ("GTW

or "Carrier") for a preliminary injunction against Defendant, Brotherhood of Maintenance of Way

Employees Division ("BMWED" or "Union").   GTW seeks an injunction to enforce the

mandatory dispute resolution procedures of the Railway Labor Act, 45 U.S.C. §§ 151-185

("RLA").  The National Mediation Board ("NMB" or "Board") has filed a post-hearing brief as

Intervener.

        The Court has previously held a hearing on the Carrier's motion for a temporary

restraining order and, subsequent to that hearing, on July 20, 2006 issued an order indicating that

this Court had determined that on the facts adduced to that point in the litigation, it appeared that

Plaintiff was ineligible for injunction under the Norris LaGuardia Act, 29 U.S.C. §101 *et seq.*

("NLGA").  The reason cited by the Court was that the evidence available at that very preliminary

hearing suggested that the Carrier had not made "every reasonable effort" to negotiate a new labor

agreement.  That would constitute a violation of the RLA and deprive the Court of the right to

issue injunctive relief, even if the Defendant, as asserted, had directed its members to create a work stoppage in violation of that Act.

Subsequent thereto the Court held a hearing on the Carrier's motion for a preliminary injunction against the Union, seeking to prohibit it from conducting another "surprise strike" against GTW and requiring the Union to give the Carrier ten (10) days notice of intent to strike over any other dispute.  After taking evidence, the Court invited memoranda from each of the three impacted parties, the Carrier, the Union and the NMB.  Those memoranda have been filed and the matter is now ready for decision.

## BACKGROUND

The Union represents GTW's employees in the "maintenance of way" area and is party to three Collective Bargaining Agreements ("CBA") covering the territories of GTW operations in multiple states.  On December 3, 2004, the Union served Section 6 notices seeking multiple changes to the CBAs and the parties thereafter engaged in direct bargaining through September 9, 2005.  GTW applied for mediation with the NMB on September 13, 2005 and that Board accepted the application the following day, docketed the dispute and has thereafter exercised jurisdiction over the dispute through the present date.

Subsequent to that docketing, the appointed mediator held mediation sessions with the parties and the parties conducted several direct negotiation sessions, without the presence of the mediator.  In short, after the March 14, 2006 mediation session, the mediator recessed the negotiations.   (A "recess" is a term and process of art; testimony at the hearing indicates it is an NMB mediator's tool to persuade the parties to reach an agreement. While the parties are in recess, the NMB does not encourage meetings without the mediator's approval.)

2

On May 22, 2006, the mediator was asked by the Union to schedule a mediation session. The mediator responded that he had reviewed the files and told the parties that no additional meetings would be scheduled and that they had to review their respective positions if they intended to reach agreement.  It is at that point and subsequent that the Union demanded that GTW negotiate a meeting outside the NMB mediation process.  However, it appears that the Carrier indicated that it was more appropriate that the NMB mediator be involved in future meetings.

On July 19, 2006, the Union struck GTW from approximately 6:00 a.m. to 11:00 p.m., when the work stoppage ended.  Thereafter, the parties met without the mediator present on four different days on two separate occasions in August 2006.  At the end of August, the Union demanded once again to have bargaining sessions without the mediator present, and promised not to strike over proposed contract changes without giving ten (10) days notice; *that promise was conditioned on the agreement of GTW to negotiate outside of the mediation process*.  It is the Union's position that it has the right to strike and that GTW is ineligible for injunctive relief since the Carrier will not agree to negotiate *directly outside the mediation process*.

On the same day that the conditional promise not to strike and demand for direct negotiations was sent, a letter was faxed from a member of the Union's bargaining committee to GTW which claimed that a routine seniority dispute constituted a "*repudiation and unilateral change of our seniority rules.*" (Italicized in original).  It appears that the underlying dispute involves an employee represented by the Union who forfeited his seniority on the DTI because, during a furlough from that entity, he had taken a job with GTW and subsequently refused to accept recall with DTI when the furlough ended.  Since DTI and GTW are treated as separate

3

railroads for seniority purposes, and GTW contends that an employee cannot refuse to accept a

recall because he is temporarily working for another railroad, it is GTW's position that the

foregoing is a correct interpretation of the applicable CBAs.  The Union now contends that it is

not required to give GTW advance notice if it decides to strike over that seniority dispute as

contrasted to the issues over which the parties have been bargaining for almost two years.

## DISCUSSION

*A.  Preliminary Injunction Standard*

Under Fed. R. Civ. P. 65, injunctive relief is an extraordinary remedy the purpose of which

is to preserve the status quo. Injunctive relief may be granted to effect preventative or protective

relief.  In the Sixth Circuit it is well settled that the following factors are to be considered in

determining whether to grant preliminary injunctive relief:

> (1) Whether the movant has shown a strong or substantial likelihood or probability
> of success on the merits; (2) Whether the movant has shown irreparable injury; (3)
> Whether the issuance of a preliminary injunction would cause substantial harm to
> others; and (4) Whether the public interest would be served by granting injunctive
> relief.

*See Mason County Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977). The Sixth Circuit

advocates a balancing approach as to these factors:

> It thus appears that the precise wording of the standard for the likelihood of success
> on the merits is not as important as a realistic appraisal of all of the traditional
> factors weighed by a court of equity. A balancing is required, and not the
> mechanical application of a certain form of words.

*Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537-38 (6th Cir. 1978) (quoting *Metro. Detroit*

*Plumbing & Mech. Contractors Ass'n v. HEW*, 418 F. Supp. 585, 586 (E.D. Mich. 1976)), *cert.*

*dismissed*, 442 U.S. 925 (1979); *see also Clinics Holding Corp., II v. Cafcomp Sys, Inc.*, 119 F.3d

393, 399 (6th Cir. 1997);  *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

4

The degree of proof necessary for each factor used in determining whether to grant preliminary injunctive relief depends on the strength of plaintiff's case on the other factors. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir.), *cert. denied,* 519 U.S. 807 (1996). The party seeking the injunctive relief carries the burden of persuasion on the above stated factors. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

*B. Likelihood of Success on the Merits*

In reviewing the three briefs before the Court and the authorities cited therein, it is clear that the Carrier and the NMB have differing views from the Union on the impact of the RLA and NLGA on this dispute. The Court, in sum, finds that the core issue before it in this major dispute as defined by the RLA (there appears to be no disagreement among the parties that this is a "major dispute") is whether control of the mediation process must be in the hands of the NMB mediator or the parties; the Defendant places that control in the hands of the parties while the Plaintiff and the NMB place it in the hands of the NMB mediator until the mediation process has been completed. The Court finds that the latter position is the correct and appropriate interpretation of the law and the authorities cited, and that the Carrier, therefore, has shown a strong likelihood of success on the merits.

Congress enacted the RLA with the primary purpose of that Act being to prevent interruptions to commerce caused by strikes in the transportation (rail) industry. The dispute resolution process is mediation, followed by voluntary arbitration and then a thirty (30) day cooling off period during which the President of the United States may appoint a public board to further assist in the resolution of the dispute. Multiple cases have held that until the dispute resolution process before the NMB has been concluded and the parties released from further

5

activities before that Board/Mediator, self-help or otherwise disturbing the status quo is

inappropriate and illegal.  In *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,*

Justice Harlan, after reviewing the processes mandated by the RLA, including mediation under the

auspices of the NMB, concluded: "While the dispute is working its way through these stages,

neither party may unilaterally alter the *status quo* §§ 2 Seventh, 5 First, 6, 10."  *See Jacksonville*

*Terminal Co.,* 394 U.S. 369, at 381. (1968).

> Further to the point is the Seventh Circuit's statement in *Burlington Northern*:

>  If a carrier would alter the prevailing status quo, such a unilateral change in
> working conditions would effectively upset the Unions' bargaining leverage and
> ability to reach a fair settlement. * * * In such an instance where the 'carrier refuses
> to follow the procedures of the Act * * * the Union may strike.'

*Burlington Northern R. Co. v.  United Transportation Union*, 862 F.2d 1266, 1281 (7th Cir. 1988).

> The Union suggests strongly that by refusing to meet outside of the mediation process,

GTW violates Sections First and Second (45 U.S.C. § 152 First and Second).  Further, such

refusal to meet fails, in the Union's view, to satisfy a requirement of Section 8 of the NLGA that

the parties must go beyond legal obligations and "make every reasonable effort to settle such

dispute either by negotiation or with the aid of any available governmental machinery of

mediation or voluntary arbitration."  *See Brotherhood of RR Trainmen v. Toledo Peoria &*

*Western,* 311 U.S. 50 (1944).   The core question in this case, in the opinion of the Court is:

assuming that the mediation continues while "recessed" by the mediator, does the failure of a

party to that mediation to meet directly outside of the NMB process create a violation of Section 8

of the NLGA?  The Court answers that inquiry in the negative.

> In its 1969 ruling on this issue, the Supreme Court traced the history of the RLA and its

purposes, which included the encouragement of the Collective Bargaining process by railroads

and their employees in an attempt to prevent wasteful strikes and interruptions of interstate

commerce.  The Court articulated the result of that Act as follows:

> To this end, the Act established rather elaborate machinery for negotiation,
> mediation, voluntary arbitration, and conciliation * * * It imposed upon the parties
> an obligation to make every reasonable effort to negotiate a settlement and to
> refrain from altering the status quo by resorting to self-help while the Act's
> remedies were being exhausted. * * * A final and crucial aspect of the Act was the
> power given to the parties and to representatives of the public to make the
> exhaustion of the Act's remedies an almost interminable process.  As we noted in
> *Railway Clerks v. Florida E.C.R. Co.*, 384 U.S. 238, 246 (1966), 'the procedures of
> the Act are purposely long and drawn out, based on the hope that reason and
> practical considerations will provide in time an agreement that resolves the
> dispute.'
>
> The Act's status quo requirement is central to its design.  Its immediate effect is to
> prevent the Union from striking and management from doing anything that would
> justify a strike.  In the long run, delaying the time when the parties can resort to
> self-help provides time for tempers to cool, helps create an atmosphere in which
> rational bargaining can occur, and permits the forces of public opinion to be
> mobilized in favor of a settlement without a strike or lockout. * * *

*Detroit & Toledo Shoreline Railroad Co. v. United Transportation Union, et al.,* 396 U.S. 142,

148-150 (1969)(internal citations omitted).

The RLA's major dispute procedures, including mediation, are designed both to provide a

forum within which resolution of disputes can be resolved, and to protect the public interest in

continuous rail and other transportation services.  *See Consolidated Rail Corp. v. Railway*

*Executives Association,* 491 U.S. 299 (1989).   The case law reflects that while a dispute over

proposed contract changes proceeds through the RLA-mandated stages of negotiation, mediation

and even arbitration, "neither party may unilaterally alter the status quo."  *Brotherhood of RR*

*Trainmen v. Jackson Terminal Co.*, 394 U.S. 369, 378 (1969).   The evidence adduced at the

hearing of this matter clearly indicates that the mediator has recessed and not terminated the

mediation process; thus, the Union may not strike until thirty (30) days after release from

7

mediation by the NMB and that prohibition is enforceable by an injunction.  *See, Brotherhood of RR Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 41 (1957).

Likewise, the Court  in the recent *Northwest Airlines Corp.* case appropriately addresses the issue as follows:

> Section 6 [of the RLA] structures a *tripartite* process in which the NMB plays a vital and unique third party role, accorded the power, as a neutral representative of the public interest, to set the timing for the parties' negotiation, monitor each stage, invoke the next stage of the status quo, and determine the longevity of the procedure and thus when the status quo may end.

*Northwest Airlines Corp. v. Association of Flight Attendants-CWA,* No 0517930-06-1679, 2006 WL 264 2194, @ *20 (S. D.  N.Y. September 14, 2006)(emphasis in original).

The conclusion stated at page 2 of the Intervener's brief places this Court's holding in stark contrast to the position of the Union:

> The Union is attempting to "dislodge the key" to the structure that Congress established, by availing itself of self-help through a strike before exhausting the RLA's mandatory dispute resolution procedures.  Neither of the parties may engage in unilateral self-help unless the NMB has released them from mediation, and in this case the Board has not released the parties but has merely temporarily recessed meetings.  Prelim. Inj. Hearing Transcript, 178, 181-182.  The Union's assertion that the Carrier's refusal to meet directly while the Board had suspended mediation meetings violated Section 2, First of the RLA, therefore, relieving the union of its status quo obligation, is contrary to well established precedent that NMB has exclusive jurisdiction over the conduct of mediation in the crucial railroad industry. *See International Ass'n of Machinists v. National Mediation Bd.*, 930 F.2d 45, 48 (D.C. Cir. 1991).  Judicial review of the Board's decisions is 'one of the narrowest known to the law.' *International Ass'n of Machinists v. National Mediation Bd.,* 839 F.2d 809, 811 (D.C. Cir. 1988), *amended,* 848 F.2d 232 (D.C. Cir. 1988), cited in *International Ass'n of Machinists v. National Mediation Bd.,* 180 F. Supp. 2d 188, 190 (D.D.C. 2002)(denying plaintiffs' motion for preliminary injunction).

The testimony of the NMB's representative at the hearing on the preliminary injunction clearly reflected that it is the Board's judgment that mediation efforts are ongoing, have not been exhausted, and allowing the passage of time without meetings is likely to result in the parties

reassessment of their positions.  Therefore, once the parties notify the NMB, as requested, that they have complied with the Board's directives, the Board is ready to resume negotiation/mediation sessions.  *See* Gibbons Declaration, Attachment 15.   It is within the mediator and the NMB's broad discretion to determine the scheduling, one might add the appropriate scheduling, of mediation sessions.  *See Aircraft Mechanics Fraternal Ass'n v. Northwest Airlines Corp.,* 394 F. Supp.2d 1082 (D. Minn. 2005).   It is the mediator assigned to the case who has the power and authority to decide when mediation sessions are to be held and when to recess the mediation; it is not the prerogative of the individual parties to make those determinations.  Courts will not intervene to usurp the role of the NMB and its mediator.   It is the protection of the process instituted pursuant to the authority and direction of the RLA that this Court must preserve for the benefit of the industry, the parties and the public.

This Court agrees with the GTW and the NMB that there is no legal support for the Union's position that the Carrier would be ineligible for an injunction if it refused to meet outside the purview of the NMB mediator while that mediation process is ongoing.  In reviewing the cases cited by all of the parties, this Court concludes that the cases reflect that courts have uniformly ruled that the NMB has the power to control negotiations, the timing of mediation sessions and related matters and that such power provides the mediator with important tools to coerce the parties to mediate successfully.  Courts have refused to order the NMB to terminate mediation in the absence of a showing of patent bad faith by an official or officials.  *See Local 808, Bldg. Maint. Serv. & RR Workers v. National Mediation Bd.,* 888 F.2d 1428, 1431 (D.C. Cir. 1989). The Union position that a party's failure to conduct face to face negotiations while the mediation process continues before the NMB mediator flies in the face of statutory and case law controlling

9

in this matter.  Thus, while the NMB has determined that a recess is appropriate as a tool in the management of these mediation negotiations, the failure of GTW to respond to the Union's demands for face-to-face negotiations is not a violation of the obligation to resort to "every reasonable approach" to resolve the dispute and, thus, does not bar the GTW from seeking injunctive relief prohibiting the Union from disturbing the *status quo* through strike or other work stoppages.

With respect to the seniority matter previously described, such dispute is to be characterized as a "minor dispute" and must be arbitrated before the National Railroad Adjustment Board or an arbitration panel established by the parties. *See* 45 U.S.C. § 153.  The foregoing is based upon what is now before this Court.  Therefore, the Union has a duty not to strike over such minor dispute and that duty is enforceable by injunctive relief.

*C.  Irreparable Injury*

The evidence adduced at the hearing on the request of the Carrier for preliminary injunction clearly indicated the nature of the irreparable injury to be suffered  from a work stoppage not only by GTW, but the automotive industry and the general public.  The Grand Trunk appears to be the artery system for the automobile industry in and around the Detroit, Michigan area.  Parts from manufacturers are moved by rail to the assembly plants and finished vehicles from those plant locations where they can be shipped to other connecting carriers. The domino effect of a work stoppage would appear to result in a shut down of the parts manufacturers with the resultant impact on the auto assembly plants' inability to get "just in time" deliveries and require cessation of operations during the stoppage.  A significant number of other industries

10

would be prevented from continuing operations.  Therefore, this branch of the prerequisites for a grant of preliminary injunctive relief has been met.

*D.  Substantial Harm to Others*

Based on an analysis of the impact of a work stoppage on Union members, the Carrier, industry and the general public, it does not appear that there is a substantial likelihood of harm to the Union or its members should a preliminary injunction issue.   As discussed above, it is clear that the intent of the RLA is to continue negotiations for the benefit of both the industry and the Union, as well as the public.  Therefore, the Court finds that this branch of the test plays in favor of GTW.

*E.  Public Policy*

The discussion in Section B above clearly indicates that the history of these matters since the adoption of the RLA in 1926 has been to protect the negotiation and mediation processes for the benefit of the public.  While public policy considerations do not drive the Court's opinion in this case, since a central purpose of the RLA and the mediation process through the NMB is to serve the public interest by providing a framework within which to resolve these type of disputes, the public interest would be best served by a granting of a preliminary injunction in this case.

*F.  Balancing the Factors*

Balancing the foregoing factors, the Court finds the equities weigh in favor of GTW. Accordingly, the Court will grant the motion of Plaintiff, GTW, and issue a preliminary injunction in accordance with the conclusions reached in this opinion.

**CONCLUSION**

11

For the reasons stated above, and for those contained in the briefs of the Carrier and the NMB with which this Court is in agreement, the Court will issue a preliminary injunction enjoining the Union from:

1.    Exercising self-help over proposed changes in the Collective Bargaining Agreements between GTW and the Union while this case remains in mediation before the NMB, and has not been terminated by the NMB, and for thirty (30) days after release from or termination of mediation;

2.    Requiring the Union to give at least ten (10) days notice in writing to GTW of its intent to strike over any dispute of any nature.

The parties are granted fourteen (14) days from the date of this order within which to either agree upon the form of such injunctive relief or to individually submit such form to the Court.  In the absence of an agreed order, this Court will forthwith issue its own injunction order.

IT IS SO ORDERED.

                                                      s/ *David A. Katz*
                                                      DAVID A. KATZ
                                                      U. S. DISTRICT JUDGE

12